J-A11022-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: P.S.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.L.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 39 MDA 2024 |

Appeal from the Decree Entered December 18, 2023
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s): 1804 of 2023

BEFORE: BOWES, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY BOWES, J.: **FILED: SEPTEMBER 10, 2024**

D.L.W. ("Father") appeals from the decree involuntarily terminating his parental rights as to his daughter, P.S.W., born in August 2022. We affirm.

Of relevance to the instant appeal, the Lancaster County Children and Youth Social Services Agency ("CYA") became involved in P.S.W.'s life when she tested positive for cocaine, methamphetamine, and fentanyl at birth.[1] *See* N.T. Hearing, 10/3/23 at 10. P.S.W. remained in the hospital for five days, during which time Father had some level of contact with her, though it is unclear how much. In addition to the substance abuse of both Mother and Father, CYA was also concerned about Father being indicated in child sexual abuse allegations in 2002, 2004, and 2018. Therefore, upon her release from the hospital at five days old, P.S.W. was placed into protective care. She has

---

[1] In October 2023, the orphans' court involuntarily terminated the parental rights of P.S.W.'s mother, I.R. ("Mother"). She has not appealed that order.

since remained in the same pre-adoptive home with her maternal half-brother. Father has not seen her since she was released from the hospital to the resource parents.

On September 27, 2022, P.S.W. was adjudicated dependent. Father's permanency plan for reunification had a single task for him to complete, namely, to undergo a psychosexual evaluation. Until he completed that assessment, the court suspended his visitation with P.S.W.

Father did not schedule the assessment on his own initially, and CYA was unable to contact him throughout the first half of October 2022. On October 17, 2022, the agency learned that he had been incarcerated that day for violating his probation by admitting to cocaine use for a third time. Although Father ultimately executed the necessary release for a referral to the Commonwealth Clinical Group ("CCG") to be scheduled for an evaluation when CYA visited him in jail in November, he could not complete the evaluation until his release on December 10, 2022. Following his release, Father failed to schedule or complete the evaluation. CYA tried to contact him twice in December, through his probation officer, but their efforts were to no avail. The agency continued to attempt contact throughout January, only to learn that he had re-entered jail on January 30, 2023.

On February 27, 2023, the trial court held a permanency review hearing, which Father did not attend. The court approved a permanency plan for Father as follows:

> Father's only reunification objective was to resolve the issues that led him to sexually offend. To complete this objective, Father was to attend a sexual offender evaluation to determine the appropriate treatment and follow all recommendations of the treatment providers. Also, Father was to have no unsupervised contact with children until agreed upon by his therapist, the victim's therapist, and [CYA]. Following the permanency review hearing, the [c]ourt found that Father was not in compliance with the permanency plan because he had no contact with [CYA] and there was no effort to complete the psychosexual evaluation that he was ordered to complete five months prior.

Trial Court Opinion, 12/11/23, at 3.

Father was released from jail sometime in late April. CYA re-established contact on May 18, 2023, at which time Father reported that he had scheduled the evaluation with CCG for June 27, 2023. The appointment was moved to July 31, 2023, because he was participating in an in-patient rehabilitation program, and again to August 2, 2023, for CCG to secure an English-speaking therapist.

Father finally completed the evaluation by phone on August 2, 2023. However, he did not provide any information regarding the sexual abuse allegations lodged against him and did not follow up with the therapist's requests for clarification. As a result, the evaluator could not set a treatment plan or assess whether Father posed a safety concern. Therefore, she recommended on September 26, 2023, that Father complete an additional psychosexual evaluation with a therapeutic polygraph test. Additionally, based on Father's self-reporting of various mental health diagnoses and an overdose in June 2023, she directed that he undergo psychiatric and drug and

alcohol evaluations, conform with any suggested therapy from those evaluations, and be granted only supervised contact with P.S.W.

In the interim, on July 26, 2023, CYA filed the petition to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (6), and (b). The orphans' court held two hearings, one on October 3, 2023, focusing on Mother, and a second hearing on November 21, 2023, regarding Father.[2] CYA presented testimony from Father's CYA caseworker, Summer Weaver, and the CCG counselor who conducted his psychosexual evaluation, Jessica Lauver. Father testified on his own behalf. Significantly, as of the November 21, 2023 termination hearing, he had not complied with Ms. Lauver's recommendations following the evaluation.

The court found that CYA had met its burden as to § 2511(a)(1), (2), (6), and (b), and entered a decree involuntarily terminating Father's parental rights as to P.S.W. on December 18, 2023. Father timely filed the instant notice of appeal and concise statement in accordance with Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court directed us to its prior opinion. Father raises the following issues for our consideration:

1. Whether the orphans' court erred in its decree dated December 18, 2023, that [CYA] had met its burden in proving that Father's parental rights should be terminated when there was

---

[2] At the hearing, Gina M. Carnes, Esquire represented P.S.W. as legal counsel and guardian *ad litem* ("GAL"). The GAL confirmed that, due to her young age, there was no conflict between P.S.W.'s legal and best interests. **See** N.T. Hearing, 11/21/23, at 65. On appeal, she filed a brief in support of termination.

- 4 -

evidence he was working on and completing his goals on his child permanency plan throughout his incarceration, drug treatment and freedom and would be completing his plan soon.

2. Whether the orphans' court erred in its decree dated December 18, 2023 in terminating Father's parental rights and not allowing additional time to complete the necessary requirements to enable reunification when Father testified under oath to the progress and efforts that were being made towards reunification with his child, P.S.W.

3. Whether the orphans' court erred when it ruled [P.S.W.]'s best interests and welfare would be served by termination of parental rights even though Father was denied visitation to his child and the record lacks clear and convincing evidence of the emotional impact on a child, having been denied the possibility of a parental bond by the court.

Father's brief at 9 (cleaned up).

We begin with the legal principles governing decrees terminating parental rights:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in

order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358–59 (Pa. 2021) (cleaned up). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Section 2511 of the Adoption Act requires a bifurcated analysis of the grounds for termination and the needs and welfare of the child:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re Adoption of B.G.S.*, 245 A.3d 700, 705 (Pa.Super. 2021) (cleaned up). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (cleaned up).

To affirm a termination order, we need only agree with any one subsection of § 2511(a), as well as § 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). As it pertains to the case *sub judice*, we consider § 2511(a)(2) and (b), which provide as follows in relevant part:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> > . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511.

The grounds for termination of parental rights under § 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct but may also "include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of M.A.B.*, 166 A.3d 434, 444 (Pa.Super. 2017). We have long recognized that a parent is "required to make diligent efforts towards the

reasonably prompt assumption of full parental responsibilities." *Id*. at 443 (cleaned up). In that regard:

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.

*Id*. (cleaned up). At a termination hearing, the orphans' court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to cooperate with the agency for a lengthy period or to take advantage of available services during the dependency proceedings. *See In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa.Super. 2010).

Father argues that "[a]lthough [he] has been incarcerated or in a drug rehab for much of P.S.W.'s short life, he did successfully complete or make significant progress in the areas required by the" permanency plan. *See* Father's brief at 16. He maintains that he asked for pictures and updates regarding P.S.W. and "[h]e wanted to pursue a close relationship with his daughter, but visits were not happening due to the court order[.]" *Id*. Father contends that CYA failed to prove a continued incapacity under § 2511(a)(2) because he completed his permanency goal, has not been incarcerated or in rehab since July 10, 2023, and was working and attending school. *Id*. at 19.

Father is correct that visits were suspended by court order. However, he alone possessed the power to have those visits reinstated by completing his psychosexual evaluation. He did not timely do that. Instead, our review of the record reveals: a history of re-incarcerations and relapses over the nine months it took Father to schedule the evaluation; a general lack of initiative to meet the solitary goal he had in order to both visit and ultimately reunify with P.S.W.; and an inability to remain drug-free and in the community.

For example, Father tested positive for cocaine and THC at a probation drug screening less than two weeks before the November termination hearing. Concomitantly, it took him eleven months to comply with his sole goal of completing the psychosexual examination, the results of which proved inconclusive and necessitated additional assessments that were never performed. Certainly, Father has made some efforts in that he did schedule and participate in the initial evaluation. We further recognize that he faced scheduling difficulties between his incarcerations and rehabilitations. However, the onus is on Father to overcome those hurdles and demonstrate diligent efforts to reunify. *See In re Adoption of M.A.B.*, 166 A.3d at 443. As aptly stated by the GAL, "[t]he fact that [Father] was either unwilling or unable to maintain his freedom for a consistent period of time is a demonstration of [F]ather's level of commitment to his child." GAL's brief at 9.

The certified record confirms the orphans' court's assessment that Father failed to expeditiously overcome his own roadblocks in scheduling the one goal he had to begin reunification with his daughter. Indeed, his lack of effort and inability to remain in the community resulted in over a year passing without Father having any visitations with P.S.W. and without any meaningful headway in determining whether he posed a safety concern. Even he recognized during his testimony that his "time was limited. [He] was in and out of incarceration and that's on [him]." N.T. Hearing, 11/21/23, at 61. Furthermore, Father readily admitted that at the time of the termination hearing he still would "have to do a lot" to be a good parent for P.S.W. *Id*. at 59. Specifically, he explained that he needed to "get [his] drug addiction under control" and "would have to have a stable job[.]" *Id*.

Stated simply, Father's delaying has prolonged his inability to care for P.S.W. and demonstrated an unwillingness to remedy those conditions. Our Supreme Court has disavowed such lackadaisical responses to reunification:

> The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021) (cleaned up). Since the record supports the court's conclusions, we hold that the orphans' court

- 10 -

did not abuse its discretion in finding statutory support for termination pursuant to § 2511(a)(2).[3]

Having found statutory support for termination under subsection (a), we now pivot to § 2511(b), which is reviewed from the child's perspective. **See Matter of Adoption of L.C.J.W.**, 311 A.3d 41, 51 (Pa.Super. 2024). In conducting a § 2511(b) analysis, the court must place the child's "developmental, physical, and emotional needs and welfare above concerns for the parent. Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis." **Id**. (cleaned up). Those emotional needs "include intangibles such as love, comfort, security, and stability." **Id**. at 52 (cleaned up). As to the bonds children share with their foster and biological parents, "[t]he court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that

---

[3] Father raises a separate issue that the court erred by granting the petition and not allowing him additional time to comply with his permanency plan. **See** Father's brief at 22-24. The gist of his argument is that "[a]lthough he did not address all of the usual requirements by the time of the filing of the [termination] petition, he was making progress and would have been able to be reunified with his daughter if given a bit more time." **Id**. at 24 (cleaned up). This claim is subsumed by our analysis of § 2511(a)(2), and we find that he is not entitled to relief for the same reasons discussed at length *supra*. We reiterate that despite several months passing between the filing of the petition and the November 2023 hearing, Father had not complied with Ms. Lauver's recommendations from September, and therefore had not made any additional progress towards reunification.

bond, which is not always an easy task." *Id*. (cleaned up). Finally, this Court "must keep the ticking clock of childhood ever in mind" and we "will not disturb [the court's bonding] assessment when [its] factual findings are supported by the record." *Id*. (cleaned up).

The CYA caseworker testified that on the few occasions where she met with Father, she "would provide an update and [Father] would ask about how his daughter's doing." N.T. Hearing, 11/21/23, at 35. As indicated in the above-recited history, Father has not seen P.S.W. since she was released from the hospital five days after she was born. Further, his visitation was suspended on September 27, 2022, and never lifted because he failed to timely comply with the psychosexual evaluation or the follow-up examination. Given this lack of contact, the court determined that P.S.W. "has no relationship with her father." Orphans' Court Opinion, 12/11/23, at 9.

On the other hand, P.S.W. "has lived in a potentially permanent placement her entire life." *Id*. Furthermore, she has thrived in that setting and is no longer in need of early intervention services. *See* N.T. Hearing, 11/21/23, at 36. The record confirms the GAL's assessment that "[w]hile [F]ather squandered his time, his daughter was growing and bonding with the resource parents and her half-brother." GAL's brief at 10.

Our review of the record bears out the orphans' court's conclusions and we discern no abuse of discretion on the court's part in determining that termination was in the best interests of P.S.W.

Based on the foregoing, we affirm the decree terminating Father's parental rights as to P.S.W.

Decree affirmed.

Judge Murray joins this Memorandum.

Judge Stabile files a Dissenting Memorandum.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 09/10/2024